| | |
|---|---|
| OPEN TEXT CORP., CARBONITE, INC. | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. <u>6:20-cv-00941</u> |
| | ) |
| ALFRESCO SOFTWARE, LTD., | ) JURY TRIAL DEMANDED |
| AND ALFRESCO SOFTWARE, INC., | ) |
| ALFRESCO SOFTWARE AMERICA, INC. | ) |
| BLUE FISH DEVELOPMENT GROUP, LTD., | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiffs Open Text Corporation and Carbonite, Inc. (collectively, "Plaintiffs" or "OpenText") allege against Defendants Alfresco Software Ltd, Alfresco Software, Inc., Alfresco Software America, Inc. (collectively "Alfresco") and Blue Fish Development Group, Ltd. ("Blue Fish") (collectively, "Defendants") as follows:

1.       Founded in 1991, Open Text Corporation evolved out of a project at the University of Waterloo that created innovated text indexing and string-search technology. For over 25 years, Open Text Corporation has provided information management solutions that allow companies to organize and manage content, operate more efficiently, increase engagement with customers, collaborate with business partners, and address regulatory and business requirements.

2.       In December 2019, OpenText acquired Carbonite, Inc., a provider of cloud-based subscription data protection, backup, disaster recovery, and endpoint security for small- and medium-sized business and prosumers. (Exhibit 1.)

3.      Open Text Corporation provides such solutions by distributing software products and providing customer support and professional services through a number of subsidiaries, including Carbonite, Inc., which sells OpenText software and services in the United States.

4.      The OpenText family of companies (collectively "OpenText") has approximately 15,000 employees, more than 74,000 customers, and over $3.11 billion in annual revenues. OpenText invested approximately $1 billion on research and development over the three years ending June 30, 2020.

5.      OpenText is a leading provider of Enterprise Content Management ("ECM") products, which refer to a variety of solutions for managing business content. One such solution provides a repository for electronic documents (such as those created via Microsoft Office, Computer-Aided Design, or Portable Document Format) and allows for functions such as organization, display, classification, access and version control, event auditing, rendition, and search. ECM also includes software tools and services for collaboration, records and email management, and archiving.

6.      OpenText's ECM provides the foundation for its offerings in a broader market category known as Enterprise Information Management ("EIM"). EIM encompasses capabilities such as Business Process Management ("BPM"), Customer Experience Management ("CEM"), Information Exchange ("IE"), and Discovery. OpenText offers a range of software products and services in each of these areas, including Documentum. OpenText's technologies have become critical to organizations looking for efficient content management options.

7.      Gartner's Magic Quadrant report for 2019, published October 30, 2019, named OpenText  a "Leader" in Content Services Platforms. And Gartner's 2019 Market Share Analysis, published July 24, 2020, ranked OpenText one of the "Top Five Content Services Providers,

Worldwide" in 2019; in particular, OpenText was ranked first for "Content Services Platforms."

8.    Upon the acquisition of Carbonite, OpenText announced that Carbonite would bring the OpenText family "a world-class channel organization and partners, allowing OpenText to bring EIM to all size customers including SMB to prosumers." (Exhibit 1.) Carbonite was among the "Overall Top Rated" companies in 2018 for data center backup software covering physical/virtual servers, databases, and enterprise applications. (Exhibit 2.) In 2013, Carbonite was also rated one of the "Five Best Online Backup Services" by consumers and was reported to be "one of the web's most popular online backup services." (Exhibit 3.)

9.    OpenText currently maintains three offices in the State of Texas, two of which are located in this judicial district, including the Austin office and the San Antonio Office. Over 60 employees work in OpenText's Austin office, including employees in engineering, customer support, legal and compliance teams, IT, and corporate development. The Austin office also hosts one of OpenText's data centers.

10.    OpenText tracks its business through four revenue streams: license, customer support, cloud services, and professional services. OpenText receives license revenue from its software products; customer support revenue from renewable support and maintenance OpenText provides to customers who have purchased its products; cloud services revenue from certain "managed hosting" services arrangements; and professional services revenue from consulting fees OpenText collects for providing implementation, training, and integration services related to OpenText's product offerings.

11.    Alfresco Software, Ltd., Alfresco Software, Inc., and Alfresco Software America, Inc. (collectively, "Alfresco"), provide ECM software in the form of online, on-premises, and hybrid content management services which can be accessed by computers or mobile devices.

12.     Alfresco's ECM software includes, without limitation, modules for Document Management, Enterprise Collaboration, Process Management, and Governance Services, such as Records Management, eDiscovery and Legal Holds, and Security and Controlled Access.

13.     Alfresco competes directly with Plaintiffs in the ECM and EIM markets by its manufacture, use, sale, and offer for sale of Alfresco's ECM software, which infringes Plaintiffs' intellectual property rights.

14.     Plaintiffs bring this lawsuit to protect their intellectual property investments and to hold Alfresco accountable for its infringement. As a result of Alfresco's unlawful competition in this judicial district and elsewhere in the United States, Plaintiffs have lost sales and profits and suffered irreparable harm, including lost market share and goodwill.

## NATURE OF THE CASE

15.     Plaintiffs bring claims under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, for the infringement of the following United States Patent No. 10,496,609 ("the '609 patent").

## THE PARTIES

16.     Plaintiff Open Text Corp. is a Canadian corporation with its principal place of business at 275 Frank Tompa Drive, Waterloo, Ontario, Canada.

17.     Plaintiff Carbonite, Inc. is a Delaware corporation with its principal place of business at 2 Ave de Lafayette, Boston, Massachusetts 02111. Carbonite, Inc. is a member of the OpenText family of companies. It is a wholly owned subsidiary of Open Text Corp.

18.     Defendant Alfresco Software, Ltd is a foreign corporation with its global headquarters at Bridge Avenue, The Place, Maidenhead, SL6 1AF, United Kingdom.

19.     Defendant Alfresco Software, Inc. is a Delaware corporation with its principal place of business at 100 Worcester St., Suite 203 in Wellesley, Massachusetts. Alfresco Software, Inc. is a subsidiary of Alfresco Software, Ltd.

20.     Defendant Alfresco Software America, Inc. is a Delaware corporation with its principal place of business at 2839 Paces Ferry Road SE, Suite 720, Atlanta, Georgia 30339.

21.     Defendant Blue Fish Development Group Ltd is a Texas limited partnership with places of business listed at 8100 Shoal Creek Blvd, Austin, TX 78757; 701 Brazos St., Suite 700, Austin, TX, 78701; and 3410 Far West Blvd., Suite 265, Austin, TX 78731.

## JURISDICTION & VENUE

22.     This action arises under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq*. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

23.     This Court has personal jurisdiction over Defendants because they regularly conduct business in the State of Texas and in this district, including operating systems and/or providing services in Texas and in this district that infringe one or more claims of the '609 patent in this forum. Alfresco has, either directly or through intermediaries such as Blue Fish, purposefully and voluntarily placed its infringing product and/or services into the stream of commerce with the intention and expectation that they will be purchased and used by customers in this District, as detailed below.

24.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(b) because, upon information and belief, Alfresco regularly conducts business within this District, has a regular and established place of business in this District, and has committed acts of infringement within this District. In addition, on information and belief, as a foreign corporation with sufficient contacts with this District, venue is proper against Alfresco

Software Ltd. in this District. Further, on information and belief, venue is proper in this District against Blue Fish Development Group, Ltd., which as set out above and below, is organized under the laws of Texas and has regular and established places of business in this District.

25. Both Alfresco Software Americas, Inc. and Alfresco Software Ltd. are registered businesses in Texas. (Exhibit 4.)

26. On information and belief, Alfresco conducts its business through locations within this judicial district, including on information and belief at least one location present from at least July 2015 through May 2020:

6. ALFRESCO SOFTWARE INC
TIN: ▮▮▮▮▮▮▮

4816 CHESNEY RIDGE DR
AUSTIN, TX 78749-1140
Jul 15

Match Names/Locations (up to 5):
ALFRESCO SOFTWARE AMERICAS INC

4816 CHESNEY RIDGE DR
AUSTIN, TX 78749-1140
May 20

(Exhibit 5.) On information and belief, Alfresco may have or has had additional locations in this judicial district. (Exhibit 5.)

27. On information and belief, Alfresco has employees in this district, including Scott Ashcraft, Technical Lead, Expert Support (Exhibit 6) and Ganessan Paramanathan, Senior Solutions Engineer, Strategic Accounts (Exhibit 7).

28. On information and belief, Alfresco relies on a network of partners to provide implementation services to its customers. For example, Alfresco represented that, by the end of 2016, it expected to have 70% of its business deployed through its channel partners. (Exhibit 8.)

29. Through its gold, and later platinum, level partner, Blue Fish, based in Austin, Texas, Alfresco and Blue Fish make, use, advertise, offer for sale, and/or sell infringing ECM

systems within this judicial district. (Exhibit 9 ("scalable Alfresco Enterprise Content Management System").) For example, beginning as early as August 14, 2009, "Alfresco Software, Inc. . . . and Blue Fish Development Group, Ltd., an ECM-focused consulting and application development firm based in Austin, TX, [ ] announced that Blue Fish ha[d] become a member of the Alfresco Software Gold Partner Program." (Exhibit 10.) Through Blue Fish, Alfresco specifically targets the "Texas region," which "offers Alfresco considerable growth potential":



(See https://www.alfresco.com/news/press-releases/blue-fish-development-group-joins-alfresco-gold-partner-program)

30.     Alfresco ECM software is Blue Fish's "recommended platform[]":



(*See* https://bluefishgroup.com/ecm-services/)

31.     Blue Fish encourages its customers to use infringing Alfresco ECM software by offering an "Alfresco Quick Start" program (Exhibit 11) program and its "Alfresco Small Bites" program, through which Blue Fish offers evaluation, installation, configuration, customization and development of Alfresco ECM software, as well as migrating documents from external sources or other ECM systems into Alfresco's ECM system. (Exhibit 12.) Blue Fish has recommended that at least several of its customers use Alfresco's ECM software and has helped migrate customers from other ECM platforms to Alfresco's ECM platform, including replacing the Texas Education Agency's FileNet ECM system with Alfresco's Enterprise Content Management System. (Exhibit 13.)

32.     Through its partner BP3, headquartered in Austin, Texas, Alfresco advertises, offers for sale, and sells infringing ECM within this judicial district. (Exhibit 14.) For example, through BP3's Austin headquarters, Alfresco is able to offer implementation services directly to enterprise customers in this district. (Exhibit 15.)



33.     Alfresco has sold infringing ECM to at least the following customers who have regular and established places of business in this judicial district:

- Pitney Bowes, with an office located at 1825B Kramer Lane Suite 100, Austin TX 78758-4965. (Exhibit 16; Exhibit 17.)

- Cisco Systems Inc., with an office located at 12515-3 Research Park Loop, Austin, TX 78759. (Exhibit 18.)

- Carlson Rezidor Hotel Group, with multiple hotels in both San Antonio and Austin, TX. (Exhibit 19; Exhibit 20; Exhibit 21.)

- Liberty Mutual Insurance, with at least two sales offices in Austin, TX. (Exhibit 22; Exhibit 23.)

- RBC Capital Markets, with offices in both Austin, TX (300 W. 6th Street, Suite 2220, Austin, TX 78701) and San Antonio, TX (303 Pearl Parkway, Suite 220, San Antonio, TX 78215). (Exhibit 24; Exhibit 25.)

- Saks Fifth Avenue, with a store at 7400 San Pedro Avenue, San Antonio, TX 78216. (Exhibit 26.)

34.     As further detailed below, Alfresco and Blue Fish's use, provision of, offer for sale, sales, and advertising of ECM software within this judicial district infringe the '609 patent. Alfresco's certified partners infringe the '609 patent by using Alfresco's ECM software within this judicial district. Alfresco's customers infringe the '609 patent by using Alfresco's ECM software within this judicial district.

35.     Alfresco encourages partners—and Alfresco and Blue Fish encourage customers—to use infringing software at least by making its content services available on its website, widely advertising those services, providing applications that allow partners and users to access those services, and providing technical support to users.

36.     Because Alfresco and Blue Fish actively target customers served by OpenText and OpenText offices in Austin and San Antonio, Alfresco and Blue Fish's infringement adversely impacts the over one hundred OpenText employees who live and work in and around this judicial district. Indeed, Alfresco and Blue Fish openly, notoriously, and deliberately targeted their infringing ECM software against OpenText's patented ECM offerings, including Documentum:

## Why Alfresco?

## Alfresco has a Great ROI

With the current economic climate, our clients are looking for ways to reduce the TCO of their ECM infrastructure. Several of our clients are migrating all or part of their content from expensive traditional ECM platforms (Documentum, FileNet,

OpenText) to other platforms that they feel have lower TCO. I've talked to at least three pharmaceutical companies, for example, that are moving part of their content out of Documentum because they feel that it's overkill for their needs. The content in question isn't regulated and isn't used very frequently, and they just can't justify the cost of Documentum licenses for it. One of my clients told me, "It's like keeping your Timex watch in a bank vault. That makes sense for a Rolex, but it's overkill for a Timex." These companies are continuing to use Documentum for their most critical content, but they are using other platforms for less critical content. OSHA, NYPD, Morgan Stanley, and Cisco are just some of the companies that have transitioned from one of the "Big Three" ECM vendors to Alfresco.

(Exhibit 27 (highlights added).)

### THE PATENT-IN-SUIT

37.     U.S. Patent No. 10,496,609 ("the '609 patent"), entitled "Systems and Methods for

Automatic Synchronization of Recently Modified Data," was duly and legally issued on December 3, 2019. A true and correct copy of the '609 patent is attached as Exhibit A.

38.     The '609 patent is valid and enforceable.

39.     The '609 patent is generally related to synchronization of shared data that has been modified. (*E.g.* '609 Patent at Abstract, cl. 1.)

40.     The specification discloses and specifically claims inventive and patentable subject matter that represents significant improvements over conventional client/server computer networks that were available at the time of filing of '609 patent and are more than just generic apparatus or software components performing conventional activities.

41.     The claimed subject matter in the '609 patent is necessarily rooted in computer technology in order to overcome technical problems specifically arising in the realm of database technology. At the time of the claimed invention in the '609 patent, there were several drawbacks suffered by then-existing techniques for data synchronization between different devices. First, some systems were "cumbersome and time-consuming" because they required users to manually store files into certain designated folders for synchronization, and users easily lost track of different versions of the same file (e.g., which version was current, where was the file initially created, and where was the file stored on different devices). ('609 Patent at 1:34-60.) Second, some systems used application-specific libraries for data synchronization, thereby rendering it "complicated or impossible" to synchronize different types of files using a single application. ('609 Patent at 2:6-9.) In view of the above drawbacks, there was a necessity to develop an "easy and intuitive" technique for data synchronization that would be independent of file type and storage location. ('609 Patent at 2:17-20.)

42. Consistent with the problem addressed being rooted in computer technology, the technical solutions recited in the '609 patent are also rooted in the same technology that cannot be performed with pen and paper or in the human mind. Some embodiments of the claimed invention address these technical problems by receiving, at a user device and from another device, a "modified version" of a synchronized file without "identification of a location of the folder" where the synchronized file is stored in the user device. ('609 patent at cl. 1.) Instead, the identification of the location of the folder is retrieved from another file stored in the user device. *Id.* To this end, the claimed invention, in some embodiments, uses a "file system watcher" on a device to identify newly created, modified, or accessed files stored on that device and a "synchronization engine" to initiate synchronization of these files to one or more additional devices. ('609 Patent at 2:24-30.) As understood by one of ordinary skill in the art, both the file system watcher and the synchronization engine are inherently rooted in the computer technology.

43. The claimed solutions recited in the '609 patent also improve the functionality and capabilities of computers. The unique file system watcher and synchronization engine used in the '609 patent allow computers to perform tasks that they could not do before, i.e., "easy and intuitive" data synchronization regardless of file type. More specifically, the synchronization engine may record or store an identification of a storage location of the synchronized files on a user device. Upon receiving a modified version of a synchronized file, the synchronization engine can retrieve the identification of the storage location of the synchronized file and may replace the previous version of the synchronized file with the newly received modified version, in the original storage location of the synchronized file. ('609 Patent at 2:24-48.) Accordingly, the user can readily locate the synchronized file (i.e., in its original location) regardless of modifications made on other devices. ('609 patent at 12:3-9.)

44. A person having ordinary skill in the art at the time of the invention of the '609 Patent would not have understood that the invention could or would be performed solely in the human mind or using pen and paper. Using pen and paper would ignore the stated purpose of the '609 Patent and the problem the patented technology was specifically designed to address. Doing so would also run counter to the inventors' detailed description of the inventions, and the language of the claims, and be a practical impossibility.

45. The claims of the '609 patent are not directed to methods of organizing human activity, a fundamental economic practice long prevalent in our system of commerce, or a building block of the modern economy. Instead, they are limited to specific solutions for data storage technology. In addition, the claimed technology does not preempt all ways for data synchronization. For example, the claims do not preclude methods of data synchronization where the user device receives the identification of the location of the folder that stores a synchronized file while receiving the modified version of the synchronized file from another device.

46. Carbonite, Inc. is the holder of all right, title, and interest in the Patent-in-Suit, including all rights to collect damages throughout the period of Defendants' infringing acts, all rights to prevent others from making, having made, using, offering for sale, or selling products or services covered by such patents, and all rights to enforce the Patent-in-Suit. Carbonite, Inc. is a wholly owned subsidiary of Open Text Corporation.

**ACCUSED PRODUCTS**

47. Alfresco Content Services provides a platform of Enterprise Content Management (ECM) Software ("the Accused Product") for enterprises and their users to store, manage, synchronize, and access content. For example, Alfresco's ECM software includes at least Alfresco Desktop Sync, and any and all similar functionality, which automatically synchronizes content

between the Alfresco repository and end user desktops, ensuring user's offline work is synchronized with the network. On information and belief, each implementation of at least Alfresco Desktop Sync (including for Mac and for Windows) and Alfresco Sync Service operates similarly for purposes of determining infringement.

## FIRST CAUSE OF ACTION
### (INFRINGEMENT OF THE '609 PATENT)

48.     OpenText realleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint.

49.     Alfresco's products and/or services that infringe the '609 patent include, but are not limited to, the Accused Products and use thereof.

50.     Alfresco makes, uses, sells, offers for sale, and/or imports the Accused Products and components thereof in the United States. On information and belief, Blue Fish uses, sells, and/or offers to sell the Accused Products and components thereof.

51.     Alfresco and Blue Fish directly infringe—literally and/or under the doctrine of equivalents—at least claim 1 of the '609 patent by making, using, selling, offering for sale, and/or importing into the United States its Accused Products and components thereof.

52.     For example, claim 1 of the '609 patent recites:

1.     A method for automatic synchronization of recently modified data between a plurality of devices, comprising:

receiving, by a first device from a second device, a modified version of a first file stored in a folder of a storage device of the first device, wherein the modified version of the first file is received by the first device from the second device without identification of a location of the folder, and wherein folder paths of the first device and the second device corresponding to storage of the first file are not synchronized;

retrieving, by the first device, the identification of the location of the folder from a second file stored on the storage device of the first device; and

replacing, by the first device, an unmodified version of the first file in the folder with the modified version of the first file.

53.     The Accused Products practice each limitation of claim 1 of the '609 patent.

54.     As recited in the preamble, the Accused Products provide a method for "automatic synchronization of recently modified data between a plurality of devices." Alfresco Desktop Sync allows automatic synchronization of content between at least two devices: a client's device (e.g., locations on a client's device) running or implementing Alfresco Desktop Sync and a device implementing Alfresco Content Services, as described by the first image below. *See* Alfresco Desktop Sync 1.4, at https://docs.alfresco.com/print/book/export/html/2424580. For example, Alfresco Content Services system includes at least a server device ("Alfresco server") running a database, as described by the second image below.  *See* Alfresco Content Services architecture, at: https://docs.alfresco.com/print/book/export/html/2544159.

# Alfresco Desktop Sync 1.4

With Desktop Sync, desktop users can securely and automatically sync content between their desktop and Alfresco Content Services.

You can easily connect to Alfresco Content Services and select folders and sites to view and work with on the desktop, even when working offline.

# System architecture

At the core of the Alfresco Content Services system is a repository supported by a server that persists content, metadata, associations, and full text indexes. Programming interfaces support multiple languages and protocols upon which developers can create custom applications and solutions. Out-of-the-box applications provide standard solutions such as document management and records management.

55.     The Accused Products provide a method "receiving, by a first device from a second device, a modified version of a first file stored in a folder of a storage device of the first device,

wherein the modified version of the first file is received by the first device from the second device without identification of a location of the folder, and wherein folder paths of the first device and the second device corresponding to storage of the first file are not synchronized" as required by claim 1 of the '609 patent. For example, a user of Alfresco Desktop Sync can select files to be synchronized between the user's device and the Alfresco server, and the selected files are stored in a folder of the user's device and maintained in a storage device (e.g., hard drive or flash drive) associated with the user's device, as described in the image below. *See* Selecting content to sync, available at: https://docs.alfresco.com/desktopsync1.4/tasks/ds-select-sync.html.



56.     A user's device that operates Alfresco Desktop Sync can receive, from the Alfresco server, modified versions of the files selected for synchronization, as described in the image below. *See*          Alfresco          Desktop          Sync          1.4,          available          at https://docs.alfresco.com/desktopsync1.4/concepts/ds-overview.html.

# Alfresco Desktop Sync 1.4

With Desktop Sync, desktop users can securely and automatically sync content between their desktop and Alfresco Content Services.

You can easily connect to Alfresco Content Services and select folders and sites to view and work with on the desktop, even when working offline.

Once the folders and sites are selected, they are automatically downloaded and visible using Microsoft File Explorer (for Windows) or Finder (for Mac).

Changes are automatically synced from Alfresco Content Services to the desktop, so the latest content is always available. This allows you to work in places where you don't have internet access, secure in the knowledge that your changes will show up in Alfresco Content Services once you're back online.

57.     On information and belief, Alfresco Desktop Sync—executed on the user's device--receives modified versions of files selected for synchronization from the Alfresco server without receiving the location of the folder where the files selected for synchronization are stored.

58.     The path of the folder at the user's desktop for storing the files selected for synchronization is different from the path of the folder (or storage location) on the Alfresco server for storing the same files, as described in the image below. *See* Selecting content to sync, available at: https://docs.alfresco.com/desktopsync1.4/tasks/ds-select-sync.html.



Folder path of second device    Folder path of first device

59.    The Accused Products provide a method "retrieving, by the first device, the identification of the location of the folder from a second file stored on the storage device of the first device" as required by claim 1 of the '609 patent. On information and belief, the user device operating Alfresco Desktop Sync uses at least one database file to store the locations of files selected for synchronization, and the user device can therefore retrieve the identification of the location of selected files from this database file.

60.    The Accused Products provide a method "replacing, by the first device, an unmodified version of the first file in the folder with the modified version of the first file" as required by claim 1 of the '609 patent. For example, in the event that the local version of a file selected for synchronization using Alfresco Desktop Sync is different from the Alfresco server's version, the user can choose to replace the local version with the Alfresco server's version, as described in the image below. *See* Desktop Sync options, available at: https://docs.alfresco.com/print/book/export/html/2499916.

To resolve a conflict, choose which version to keep, Alfresco or your changes and click Keep:



- <u>Alfresco Version: Replaces the local file with the Alfresco copy.</u>
- My Version: Copies updates made to content locally to Alfresco.

61.     Each claim in the '609 patent recites an independent invention. Neither claim 1, described above, nor any other individual claim is representative of all claims in the '609 patent.

62.     Defendants actively induced and are actively inducing infringement of at least claim 1 of the '609 patent, in violation of 35 U.S.C. § 271(b).

63.     Alfresco and Blue Fish's customers and end users of the Accused Products directly infringe claim 1 of the '609 patent, at least by using the Accused Products, as described in the paragraphs above.

64.     Defendants knowingly induce infringement of at least claim 1 of the '609 patent by customers and end users of the Accused Products with specific intent to induce infringement, and/or with willful blindness to the possibility that its acts induce infringement, through activities relating to selling, marketing, advertising, promotion, support, and/or distribution of the Accused Products in the United States.

65.     Defendants instruct customers and end users, at least through its marketing, promotional, and instructional materials and/or training to use the infringing Accused Products, as described in detail in the paragraphs above.

66.     Defendants advertise and instruct third parties on how to use the Accused products.

67.     In addition to marketing the Accused Products for use in an infringing manner, Alfresco also provides customer service to purchasers of the Accused Products that directs and encourages customers of the Accused Products to use the Accused Products in an infringing manner. Blue Fish provides training to customers of the Accused Products that directs and encourages customers of the Accused Products to use the Accused Products in an infringing manner.

68.     Defendants have sales and technical support staff that assist Alfresco's customers and end users and provide instructions for the use of the Accused Products in an infringing manner in the United States.

69.     At least Alfresco contributes to infringement of the '609 patent by offering to sell, selling, and importing into the United States the Accused Products and components thereof, including, for example, the Alfresco Sync Services and associated software applications. Such components are substantial, material parts of the claimed inventions of the '609 patent and have no substantial non-infringing use.

70.     The Alfresco Sync Services and associated software applications supplied by Alfresco are especially made and especially adapted for use in infringing the '609 Patent and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

71.     Defendants' infringement of the '609 patent is without license or other authorization.

72.     Alfresco's and Blue Fish's continued infringement of the '609 patent has damaged and will continue to damage Plaintiffs.

73.     Unless and until enjoined by this Court, Defendants will continue to directly infringe as well as induce and contribute to infringement of the '609 patent.

74.     Defendants' infringing acts are causing and will continue to cause Plaintiffs at least irreparable harm, for which there is no adequate remedy at law. Under 35 U.S.C. § 283, Plaintiffs are entitled to a permanent injunction against further infringement.

## PRAYER FOR RELIEF

WHEREFORE, OpenText respectfully requests the following relief:

a) That this Court adjudge and decree that Defendants have been, and are currently, infringing the Patent-in-Suit;

b) That this Court award damages to Plaintiffs to compensate it for Defendants' past infringement, through the date of trial in this action, of the Patent-in-Suit;

c) That this Court award pre- and post-judgment interest on such damages to OpenText;

d) That this Court order an accounting of damages incurred by Plaintiffs between six years prior to the filing of this Complaint and the entry of a final, non-appealable judgment;

e) That this Court determine that this patent infringement case is exceptional pursuant to 35 U.S.C. §§ 284 and 285 and award OpenText enhanced damages and its costs and attorneys' fees incurred in this action;

f) That this Court preliminarily and permanently enjoin Defendants from infringing the Patent-in-Suit;

g) That this Court order Defendants to:

(i) recall and collect from all persons and entities that have purchased any and all

products found to infringe the Patent-in-Suit that were made, offered for sale, sold, or otherwise distributed in the United States by Defendants or anyone acting on their behalf;

(ii) destroy or deliver all such infringing products to Plaintiffs;

(iii) revoke all licenses to all such infringing products;

(iv) disable all web pages offering or advertising all such infringing products;

(v) destroy all other marketing materials relating to all such infringing products;

(vi) disable all applications providing access to all such infringing software; and

(vii) destroy all infringing software that exists on hosted systems,

h) That this Court, if it declines to enjoin Defendants from infringing the Patent-in-Suit, award damages for future infringement in lieu of an injunction; and

i) That this Court award such other relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs respectfully request a trial by jury on all issues triable thereby.

DATED:  October 9, 2020

By:    /s/ Steven Sprinkle

Steven Sprinkle
TEXAS BAR NO. 00794962
SPRINKLE IP LAW GROUP, P.C.
1301 W. 25TH STREET, SUITE 408
AUSTIN, TEXAS 78705
TEL: 512-637-9220
SSPRINKLE@SPRINKLELAW.COM

Christopher C. Campbell
Virginia Bar No. 36244
Yushan Luo (*pro hac vice to be filed*)
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, DC 20006
Telephone: (202) 626-5578
Facsimile: (202) 626-3737
ccampbell@kslaw.com
yluo@kslaw.com

Britton F. Davis (*pro hac vice to be filed*)
Angela Tarasi (*pro hac vice to be filed*)
Mikaela Stone (*pro hac vice to be filed*)
KING & SPALDING LLP
1515 Wynkoop St.
Suite 800
Denver, CO 80202
Telephone: (720) 535-2300
Facsimile: (720) 535-2400
bfdavis@kslaw.com
atarasi@kslaw.com
mikaela.stone@kslaw.com

*Attorneys for Plaintiffs Open Text Corp. and Carbonite, Inc.*